# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| GENE HERRING, | ) |
| | ) No. 12 CV 8447 |
| Plaintiff, | ) |
| | ) |
| v. | ) Magistrate Judge Young B. Kim |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner, Social Security | ) |
| Administration,[1] | ) |
| | ) May 20, 2014 |
| Defendant. | ) |

## MEMORANDUM OPINION and ORDER

Gene Herring seeks disability insurance benefits ("DIB"), 42 U.S.C. §§ 416(i), 423, and supplemental security income ("SSI"), *id.* §§ 1382, 1382c(a)(3)(A), based on his claim that he is disabled by a combination of avascular necrosis in his hips and a hearing deficit. After the Appeals Council declined to review an administrative law judge's ("ALJ") decision denying his applications, Herring filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Herring's motion for summary judgment is granted and the government's motion is denied:

## Procedural History

In 2008 Herring protectively filed applications for a period of disability and DIB and for SSI, claiming a disability onset date of October 30, 2007.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of Social Security on February 14, 2013—is automatically substituted as the named defendant.

(Administrative Record ("A.R.") 157, 165.) After his claims were denied initially and upon reconsideration, (id. at 73-76), Herring requested and was granted a hearing before an ALJ. That hearing took place via videoconference on July 27, 2010. (Id. at 42-72.) On September 2, 2010, the assigned ALJ denied Herring's applications for DIB and SSI. (Id. at 34.) When the Appeals Council denied review, (id. at 1-7), the ALJ's decision became the final decision of the Commissioner, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Herring filed the current suit seeking judicial review of the Commissioner's final decision. *See* 42 U.S.C. § 405(g). According to Herring's complaint, the Commissioner found him disabled as of September 2010 based on a separate application for benefits not at issue here. (R. 1, Compl. ¶ 8.) Herring is currently seeking review of the denial of his claim from his alleged onset date of "October 30, 2007, to the present." (Id. ¶ 9.) The parties have consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c).

**Facts**

In March 2004 Herring was diagnosed with an erosive lesion compressing his brain stem. (A.R. 559.) He underwent brain surgery, after which he experienced facial nerve weakness, recurrent headaches, and hearing loss in his left ear. (Id. at 562-63.) In 2007 Herring also began experiencing hip pain resulting from a degenerative disease called avascular necrosis, which involves the death of cells because of deficient blood supply. *See* STEDMAN'S MEDICAL DICTIONARY (27th ed. 2000). Herring claims that the combination of his partial deafness and his hip pain

2

became disabling in October 2007. At his hearing before the ALJ, Herring presented both documentary and testimonial evidence in support of his claims.

**A.   Medical Evidence**

Following his October 2004 brain surgery, the neurologist monitoring Herring's recovery recommended that he stay off of work until November 2006. (A.R. 259, 566.) In May 2007 Herring was evaluated by an ear, nose, and throat specialist, Dr. Dwight Grady, who observed that Herring had "[p]rofound left sensorineural hearing loss across all frequencies." (Id. at 306.) Dr. Grady opined that Herring's hearing loss would be permanent and that he could not benefit from amplification. (Id.) He recommended that Herring "strictly protect his right ear from noise exposure." (Id.)

In September 2007 Herring reported to an emergency room complaining of sharp pain in his right hip that became worse with weight-bearing, lifting, and bending. (Id. at 309.) Based on his review of an x-ray of Herring's right hip, the attending physician suspected avascular necrosis and referred Herring for a follow-up MRI. (Id. at 310.) That MRI confirmed the doctor's suspicion, showing bilateral avascular necrosis of Herring's femoral heads, more progressive in the right hip, with associated joint effusion, edema, sclerosis, and subchondral mild collapse. (Id. at 319.)

Herring's main doctor in 2008 and 2009 was Dr. Robert Blair, who monitored Herring's hip pain and treated him with pain medication. (Id. at 332.) Although Dr. Blair noted that Herring's condition might eventually require bilateral hip

3

replacement surgery, he described him in April 2008 as "doing fairly well with his hips." (Id. at 333-34.) He noted that Herring showed a full range of motion and no pain on a Patrick's exam, a flexion and extension test designed to evaluate hip pathology. (Id.) Although he characterized Herring as being in "minimal discomfort," he strongly advised him against work that requires standing, walking, and lifting, noting that he "really would do better with a more sedentary type activity." (Id. at 350.) In the months that followed, Dr. Blair's notes reflect that when Herring was taking a pain medication called Naproxen he did well, but he frequently could not afford to buy the medicine and would end up in the emergency room with significant pain. (See, e.g., id. at 332-33, 467.) At those ER visits Herring was prescribed pain medications including Percocet, Darvocet, and Vicodin. (Id. at 474-80, 502-06, 515-20, 524-27.) Herring reported to more than one ER doctor that the Naproxen did not fully relieve his pain. (Id. at 536, 544.) Herring also reported that he experiences intense pain when he overexerts himself. (Id. at 536.)

Even when Herring's pain was controlled by medication, Dr. Blair expressed ambivalence about his ability to work. In October 2008 he described Herring as being "disabled from any sort of significant physical activity," but noted that "the possibility of sedentary work might be reasonable in the future but certainly not at this point." (Id. at 333.) In December 2008 Dr. Blair characterized Herring as being "disabled from any significant standing, walking, lifting, or any type of heavy work." (Id. at 332.) He reiterated that point in a February 2009 letter, but

4

recommended that Herring train for a sedentary job. (Id. at 451.) In his most recent notes, dated June 2009, Dr. Blair noted that Herring "does fairly well as long as he's on his medicine" but again opined that he is "disabled for most types of work and probably anything that he's trained for." (Id. at 467-68.)

The medical record also includes two residual functional capacity ("RFC") assessments performed by consulting state physicians. (Id. at 322, 353.) In November 2008 medical consultant Dr. Perry White reviewed Herring's file and opined that he could sit, stand, or walk for about six hours in an eight-hour day and frequently lift ten pounds. (Id. at 323, 331.) Dr. White noted that Herring's allegations are credible and supported by medical records, but opined that he can perform light work because Herring himself reported "that he is asymptomatic." (Id. at 329.) Two months later medical consultant Dr. Melvin Clayton concurred that Herring could perform light work. (Id. at 354, 360.) Dr. Clayton acknowledged Dr. Blair's opinion that Herring could not perform significant physical activity or standing, but Dr. Clayton discounted those opinions as being reserved for the Commissioner and contradicting reports that Herring walks without a limp. (Id. at 359.) Dr. Clayton also described Herring's allegations as being only "partially credible," because in his opinion Herring's physical examinations demonstrated his ability to perform light work. (Id. at 360.)

**B. Vocational Evidence**

In May 2008 Herring was referred for an evaluation with state vocational evaluator Skip Dougherty. (A.R. 261-66.) Herring reported to Dougherty that he

5

was "a little sore" but said that he was "in pretty good health." (Id. at 262.) Dougherty wrote that it would be appropriate for Herring to attend community college to train for a job at the sedentary level, but noted that he would need to acquire computer skills and improve his math skills to succeed. (Id. at 263.) He noted that in his opinion Herring "could probably perform some jobs in the light strength range if he could receive an accommodation of alternating between sitting and standing." (Id.) Dougherty also wrote that Herring "would probably need to work in an environment where the usual noise level is rather low" to accommodate his partial deafness. (Id.) Based on the results of an oral directions test, Dougherty noted that Herring "would probably be able to correctly learn and perform simple, one to three step directions and tasks if he is just presented the directions or tasks orally," and wrote that he would probably need a visual demonstration and hands-on practice to learn more complex tasks. (Id. at 266.)

C. **Herring's Hearing Testimony**

At his July 2010 hearing before an ALJ, Herring testified that his primary disabling condition is the pain he experiences in both hips and his lower back. (A.R. 52.) He testified that his pain medications make him drowsy and "pretty much out of it" all of the time. (Id. at 52, 58.) He also testified that since his brain surgery he has had crushing headaches and blurry vision up to three times a week, but he takes the same pain medications he takes for his hips and back to treat his headaches. (Id. at 54.) He testified that he is "fighting pain pretty much all day" and that the pain keeps him from sleeping for more than three or four hours at

night. (Id. at 58.) Herring testified that because of his intense pain he is unable to bend or to walk for more than a half mile and can stand or sit for only 40 minutes. (Id. at 58-59.)

Herring also described his daily activities, noting that he lives with his girlfriend and he depends on her to drive him distances longer than 10 miles. (Id. at 46-47.) As far as chores Herring said that he is unable to help with laundry or take out the trash, but can help put dinner plates on the table and fold towels. (Id. at 59-60.) Herring testified that he has been trying to take college classes, but it is difficult because of his pain. (Id. at 61.) He said that he makes it work because he is able to get up and move around and he often takes breaks because he is unable to sit for long periods. (Id.) Herring also reported that he struggles to pay attention to computer screens because of his pain and because of his medication's side effects. (Id. at 62.) He takes "maybe 10 credits" at a time and has a 2.75 GPA, but testified that he was not taking any classes that were "too hard." (Id. at 67.)

### D. Vocational Expert's Hearing Testimony

The ALJ also elicited testimony from Vocational Expert ("VE") Julie Little, who described the kinds of work that a hypothetical individual with various limitations could perform. When asked to assume a person with Herring's age, education, and work background who can perform sedentary work that did not involve exposure to hazards, the VE testified that he could work as an order clerk, food checker, or charge account clerk, all jobs that exist in significant numbers in the state and national economies. (A.R. 69.) She testified that the hypothetical

7

individual could perform those jobs even if he would have to alternate between sitting and standing throughout the day, never being in either position for more than 30 minutes at a time. (Id. at 70.) When the ALJ asked if the ability to perform those jobs would be impacted by a limitation to avoid extensive oral communication and noisy environments, she answered that they would not. (Id.) However, the VE also testified that if all of Herring's allegations about his pain were true, he would not be able to engage in any work. (Id.)

**E.     The ALJ's Decision**

The ALJ concluded that Herring is not disabled within the meaning of the Social Security Act. (A.R. 34.) In so finding, the ALJ applied the standard five-step sequence, requiring him to analyze:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.

*Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If at step three of this framework the ALJ finds that the claimant has a severe impairment that does not meet or equal one of the listings set forth by the Commissioner, he must "assess and make a finding about [the claimant's RFC] based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The ALJ then uses the RFC to determine at steps four and five whether the claimant can return to his past work or to different available work. *Id.* § 404.1520(f),(g).

8

Here, at steps one and two of the analysis the ALJ found that Herring had not engaged in substantial gainful activity since October 30, 2007, and that he has severe impairments consisting of degenerative joint disease of the hip and a hearing deficit. (A.R. 30.) The ALJ concluded at step three that none of these impairments are of listings-level severity before turning to the question of Herring's RFC. (Id. at 30-31.) The ALJ determined that Herring has the RFC to perform sedentary work except that he cannot work around hazards, must be able to alternate between sitting and standing at 30-minute intervals, and must "avoid extensive oral communication." (Id. at 31.) The ALJ wrote that he found Herring's testimony "only partially credible" and said that "the treating and examining opinions agree that the claimant is capable of performing sedentary work." (Id. at 31-32.) At step four the ALJ concluded that Herring's RFC precludes him from performing his past work, but at step five he determined that Herring could work as an order clerk, food checker, or charge account clerk. (Id. at 32-33.) Accordingly, the ALJ concluded that Herring is not disabled and denied his applications. (Id. at 34.)

**Analysis**

This court reviews the ALJ's decision only to ensure that it is free of legal error and supported by substantial evidence. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation and quotation omitted). Although this court will neither reweigh the evidence nor substitute its own judgment for that of the ALJ, it will reverse

where the ALJ fails to develop the required "logical bridge" between the evidence and his conclusions. *See Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

In challenging the ALJ's decision Herring argued in his opening brief that the ALJ made reversible errors in assessing his credibility, crafting his RFC, and failing to rule on his request to amend his alleged disability onset date to June 2004. But Herring withdrew the third argument in his reply brief, conceding that "the ALJ made no error with respect to this issue," because "more than four years elapsed between the 2004 denial and the ALJ's 2010 decision." (R. 23, Reply at 6.) Herring's choice to withdraw this argument leaves open only the debates surrounding the ALJ's credibility and RFC determinations.

### A. The Credibility Determination

Herring argues that the ALJ's finding that he is "only partially credible" should be reversed because, according to him, the ALJ improperly relied on boilerplate language and neglected to evaluate his pain allegations in compliance with the factors set forth in agency regulations. As Herring points out, the ALJ's credibility finding here is "sparse," resting in part on the following boilerplate language: "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (A.R. 31.) As the Seventh Circuit has repeatedly pointed out, this "hackneyed" language not only is unhelpful in providing the reviewing court any insight into the reasons driving the ALJ's decision to discredit a claimant, but gets things backwards by suggesting

10

that the claimant's credibility was accounted for only after the RFC was determined. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012). But as unhelpful as this language might be, its use only amounts to reversible error in a situation where the ALJ fails to provide any additional, supported reasons to back up the credibility finding. *See Schomas*, 732 F.3d at 708; *Shideler v. Astrue*, 688 F.3d 306, 311-12 (7th Cir. 2012). The ALJ's decision in this case presents that situation.

The only explicit reason the ALJ provided—beyond the useless boilerplate—to explain his decision to discount Herring's testimony is that "his subjective complaints of the inability to perform any substantial activity are belied by his other actions and activities." (A.R. 31.) The only "action and activity" the ALJ identifies is Herring's ability to "attend educational classes and maintain a GPA of 2.75." (Id.) Although the ALJ's credibility determination is entitled to substantial deference, where, as here, it "rests on objective factors or fundamental implausibilities rather than subjective considerations," the court has "greater freedom" to review it. *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (internal quotation omitted). Essentially, as far as this court can tell, the ALJ decided that Herring was exaggerating his pain allegations based entirely on the objective fact that he attended community college classes and maintained a 2.75 GPA. But in reaching that conclusion, the ALJ failed to account for Herring's testimony detailing the ways in which his pain and concentration limit his ability to function in class. For example, Herring made clear that it is only possible for him to

take classes because he is allowed to get up, move around, and take breaks whenever he needs to. He said that he has maintained a 2.75 GPA by taking only 10 credit hours and enrolling in classes that are not too hard. The ALJ's decision provides no insight into whether he considered those qualifications in how Herring dealt with his courses before concluding that his GPA is inconsistent with disabling pain. Instead, the ALJ's solitary reason for discrediting Herring improperly equates Herring's ability to get through community college courses on a part-time basis with the ability to engage in full-time work. The Seventh Circuit has described that kind of reasoning as a "deplorable" hallmark of disability determinations, *see Bjornson*, 671 F.3d at 647, noting that an ALJ should not discredit a claimant who performs part-time work without first asking "the critical questions" about how the claimant performs that work, the hours he keeps, and his absentee rates, *see Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). In other words, a claimant's "willingness and ability to stay engaged in commendable but limited endeavors part-time or at [his] own pace" should not be used to discredit him unless the ALJ explains why those activities are inconsistent with his testimony. *See Jelinek*, 662 F.3d at 812-13. Any such explanation is absent here.

Also absent from the ALJ's credibility analysis is any discussion of the factors that the regulations require an ALJ to grapple with in assessing the credibility of a claimant's pain allegations. *See* 20 C.F.R. § 404.1529(c); SSR 96-7p, 1996 WL 374186, at *3 (1996); *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). Those factors include the claimant's daily activities; the timing and duration of his pain;

12

the type, dose, and effectiveness of the claimant's medications; and the attendant side effects from those medications. SSR 96-7p, 1996 WL 374186, at *3. Herring testified that his pain medication makes him feel drowsy, tired, and "out of it" all of the time. (A.R. 52, 58.) He testified that he has pain all of the time, and crushing headaches three times a week. (Id. at 54.) His medications are only partially helpful in controlling his pain. (Id. at 58.) Herring said that his ability to perform chores, drive, and use the computer are all limited by his pain and concentration problems. (Id. at 46, 59-60, 62.) The ALJ's decision ignores this evidence, leaving this court with no sense of how or whether the ALJ analyzed the required factors.[2] The ALJ included in his RFC analysis a paragraph listing some of the medical evidence pertaining to Herring's hip pain, but he made no attempt to link that list to his credibility analysis or to explain whether or how he perceived it to conflict with Herring's complaints. (A.R. 32.) Without any analysis of Herring's testimony describing his daily activities and medication issues, the ALJ's credibility finding lacks the specific reasons necessary "to make clear to the individual and any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *See* SSR 96-7p, 1996 WL 374186, at *4. Accordingly, the decision lacks "a logical bridge" between the evidence and the ALJ's conclusion that Herring's testimony is only partially credible. *See Shauger*, 675 F.3d at 697-98; *see also Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001)

---

[2] Although the ALJ wrote at the beginning of the RFC assessment, in another example of what appears to be boilerplate language, that he considered the evidence "based on the requirements of . . . 96-7p," at no point did he describe those factors or explicitly discuss them in the analysis portion of his RFC assessment. (A.R. 31.)

(remanding where ALJ's decision offered "no clue as to whether she *examined* the full range of medical evidence as it relates to his claim" (emphasis in original)).

The lack of a sufficient credibility analysis does not mean that Herring should be found disabled. But the Seventh Circuit has made clear that an erroneous credibility determination mandates a remand "unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014); *see also Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011) (noting that an inadequate credibility determination is "reason enough" to reverse an ALJ's decision). Here, the VE explicitly testified that if Herring's descriptions of the limiting impact of his pain were believed, he would not be able to work at all. (A.R. 70.) Accordingly, the credibility determination is critical here and the case must be remanded for a new explanation of the ALJ's credibility findings.

**B.     The RFC Determination**

Herring also challenges the ALJ's RFC determination, first arguing that it stems from what he characterizes as the ALJ's erroneous reading of the medical opinions and a failure to account for all of his limitations. Specifically, Herring takes issue with the ALJ's decision to give significant weight to what he described as the treating and examining doctors' agreement "that the claimant is capable of performing sedentary work, and that he could work at that level even with a sit/stand option." (A.R. 32.) In addition to citing the medical opinions, the ALJ gave significant weight to Dougherty's vocational opinion, which he characterized as

saying that Herring "could perform sedentary work and some light work in a quiet environment." (Id.) Herring urges reversal because, he argues, the opinions the ALJ relied on indicate that he "is more limited than the ALJ found." (R. 20, Pl.'s Br. at 8-9.)

Although in some ways Herring's argument seems to invite the kind of hair-splitting exercise that the Seventh Circuit has warned against, *see Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (noting that the court's role is not to nit-pick the ALJ's decision), because the ALJ provided no narrative description of the treating and examining opinions nor explained *how* they support the RFC assessment, the court is once again left with a collapsed logical bridge. It is true that both of the consulting physicians determined that Herring is capable of sedentary or even light work, but as Herring points out, his treating physician, Dr. Blair, seemed less convinced. Dr. Blair weighed in numerous times with opinions about Herring's work-readiness. Although in April 2008 he suggested that Herring might "do better with a more sedentary type activity" than a job that requires standing, walking, or lifting, by October 2008 he wrote that sedentary work "might be reasonable in the future but certainly not at this point." (A.R. 333.) Two months later Dr. Blair characterized Herring as "disabled from any significant standing, walking, lifting, or any type of heavy work." (Id. at 332.) In February 2009 he suggested that Herring train for a sedentary job, but in June of that year he wrote that Herring is "disabled for most types of work and probably anything that he's trained for." (Id. at 451, 468.) Dr. Blair's notes all seem to indicate that he thought Herring might be

15

able to engage in some limited sliver of work, but never solidly endorsed him to be ready for sedentary work. So when the ALJ writes that Dr. Blair "agrees" that Herring is capable of sedentary work without providing any further explanation, it is unclear how he resolved the ambiguity in Dr. Blair's opinions or balanced them against the consulting physician's opinions. In other words, because the ALJ's explanation here is so bare-bones, the court is unable to tell whether the ALJ ignored the aspects of Dr. Blair's opinions that detract from his conclusion or considered the ambiguity and interpreted Dr. Blair's notes as endorsing Herring for sedentary work all along. On remand, the ALJ should clarify his reasons for finding Dr. Blair's notes to be in line with his conclusions regarding Herring's RFC.

Herring also argues that even though the ALJ wrote that he gave significant weight to Dougherty's opinion regarding what he described as Herring's "need to work in an environment where the usual noise level is rather low," (A.R. 263), the RFC restricting his exposure to "extensive oral communication" fails to account for that limitation. Although Herring acknowledges that the VE testified that a limitation to "no noisy environments" would allow the jobs she highlighted, Herring now argues that "no noisy environments" is not the same as a "low-noise environment." (R. 20, Pl.'s Br. at 11.) This argument pushes too far into the realm of nit-picking. Although it is true that "no noisy environments" would leave on the table work places of moderate—rather than low—noise levels, Herring cites no evidence that he is unable to tolerate moderate noise, especially in a situation where he is not required to engage in extensive oral activity. Although there is

evidence that he was advised to protect his right ear from noise exposure, (A.R. 306), there is no evidence that he has since avoided situations involving just moderate noise. Even Dougherty's opinion is qualified to stating that Herring "probably" needs to work where the "usual" noise level is low. In short, the noise restrictions the ALJ put in place are sufficiently supported by the evidence surrounding Herring's hearing deficit.

Herring makes a better point, however, in arguing that the ALJ failed to account for what Dougherty described as his limitations in learning new tasks. Dougherty wrote that the results of an oral directions test that he administered to Herring showed that he can learn "simple, one to three step directions and tasks if he is just presented the directions or tasks orally," but that he "would probably require a visual demonstration as well as oral directions, possibly along with some hands-on practice in order to learn more complex directions or tasks successfully." (A.R. 266.) The ALJ wrote that he gave "significant weight" to Dougherty's opinion, but never acknowledged or accounted for the limitations Dougherty assessed with respect to Herring's ability to learn new tasks. On remand, the ALJ should either account for the limitations Dougherty cited in his questions to the VE to ensure that the jobs he describes are consistent with this limitation, *see Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004), or explain why he does not agree with that aspect of Dougherty's opinion.

Herring also argues that the ALJ failed to explain how an option to alternate between sitting and standing at 30-minute intervals adequately accommodates his

pain-related limitations. Again, his reasoning turns on a level of hair-splitting that is beyond the reviewing function of this court. *See Rice*, 384 F.3d at 369. He argues that the 30-minute sit/stand option is unsupported by Dougherty's opinion because although he wrote that Herring "could probably perform some jobs in the light strength range if he could receive an accommodation of alternating between sitting and standing," Dougherty did not say he could perform sedentary work with that limitation. (A.R. 263.) But Dougherty opined that Herring "will need to find work that is in the DOT's sedentary strength range." (Id.) The ALJ was entitled to infer from this that Dougherty believed Herring capable of sedentary work and that he only needed a sit/stand option in situations involving light work. The ALJ's decision to include the sit/stand option with an RFC for work at the sedentary level thus worked in Herring's favor compared to Dougherty's opinion. And Herring's argument that the 30-minute interval is inconsistent with his testimony is similarly unfounded. Herring testified that he can sit for 40 minutes at a time and stand for 40-45 minutes at a time. (Id. at 59.) He now argues that this testimony does not support a finding that he could alternate continuously between sitting and standing at 30-minute intervals for an eight-hour day. (R. 20, Pl.'s Br. at 12.) Essentially, Herring asks this court to draw a different inference from his testimony than the one the ALJ drew. But that is not this court's role. *See Terry*, 580 F.3d at 475. Because a reasonable mind could find that the evidence the ALJ cites adequately supports the inclusion of a sit/stand option, the court finds no error in his inclusion of that limitation in Herring's RFC. *See Richardson*, 402 U.S. at 401.

Finally, Herring argues that the ALJ's RFC analysis improperly failed to account for the limitations stemming from what he describes as his frequent, severe headaches. He rightly points out that the ALJ failed to mention his headaches anywhere in the RFC analysis, even though he testified that he experiences headaches that feel "like my head is being crushed" and related blurry vision up to three times a week. (A.R. 54.) The ALJ may have disregarded that limitation because it is based largely on Herring's own testimony, which the ALJ found to be only partially credible. But because this court finds that the credibility determination must be more fully explained on remand, the ALJ should reconsider whether to give any weight to his headache testimony, and if so, how much. The ALJ should keep in mind the substantial medical evidence suggesting that Herring reported episodic headaches following his 2004 brain surgery. (Id. at 554.) In short, on remand the ALJ should explain whether and how Herring's described headaches and blurred vision impact his RFC. *See Indoranto*, 374 F.3d at 474 (remanding where "[n]oticeably absent from the ALJ's order is a discussion of how [the claimant's] headaches and blurred vision affected her ability to work").

**Conclusion**

For the foregoing reasons, Herring's motion for summary judgment is granted, the Commissioner's is denied, and the case is remanded for further proceedings consistent with this opinion.

**ENTER:**

_____
**Young B. Kim
United States Magistrate Judge**